THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff and Counterdefendant, *v.* ROLAND W. FRIEDER, d/b/a Joliet Industrial District, Defendant-Counterplaintiff and Third-Party Plaintiff-Appellant.—(PENN-DIXIE STEEL CORPORATION *et al.*, Third-Party Defendants-Appellees.)

Third District    No. 80-103

Opinion filed November 17, 1980.

James T. Bradley, of Thomas, Wallace, Feehan & Baron, Ltd., of Joliet, for appellant.

Richard C. Robin and Joan P. Simmons, both of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellee Stauffer Chemical Company.

Harry D. Leinenweber, of Dunn, Leinenweber & Dunn, of Joliet, for appellee Penn-Dixie Steel Corporation.

Mr. JUSTICE BARRY delivered the opinion of the court:

On May 12, 1975, the State of Illinois filed suit against Roland Frieder, d/b/a Joliet Industrial District, seeking injunctive relief and penalties for violation of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1975, ch. 111½, par. 1001 *et seq.*) (No. W75G1203CH). In response, Frieder filed an answer, counterclaim, and third-party complaint against Penn-Dixie Steel Corporation and Stauffer Chemical Company, alleging that these third-party defendants were responsible for the sanitary sewage backup problems experienced by the third-party plaintiff. A second complaint, virtually identical to the first, was filed by Frieder against both third-party defendants on April 12, 1976 (W76G1090CH). In this second complaint, Frieder added two counts against Penn-Dixie, an adjoining landowner, alleging that Penn-Dixie "or its predecessors in interest * * * caused, constructed, or permitted to be caused or constructed a leveling and filling of their real estate so as to block and impede the natural flow and drainage of surface waters * * * from the Plaintiff's real estate * * * ." In count IX, the first of the two additional counts, Frieder asked for $300,000 in damages plus costs against Penn-Dixie, and in count X Frieder sought injunctive relief. The two cases were consolidated in the trial court in 1976.

On May 8, 1978, by agreement between all interested parties, the State of Illinois dismissed its complaint against Frieder, and Frieder voluntarily dismissed his original third-party complaint against Penn-Dixie and Stauffer. Subsequently, on July 20, 1979, again by agreement, summary judgment was entered against Frieder and in favor of Penn-Dixie and Stauffer on the first eight counts of Frieder's complaint filed in No. W76G1090CH. These counts were accordingly dismissed with prejudice. Both this order and the order of May 8, 1978, expressly reserved to Penn-Dixie and Stauffer the right to proceed against Frieder under section 41 of the Civil Practice Act for the purpose of recovering attorney's fees and costs incurred by them in defending both actions (Ill. Rev. Stat. 1979, ch. 110, par. 41). Such motions had in fact been made by both Penn-Dixie and Stauffer prior to July 20, 1979, but ruling on these motions had been postponed pending the outcome of case No. W76G1090CH. A hearing was held on the defendant's motions on September 12, 1979, and on September 27 the circuit court granted the defendant's motions for attorney's fees and costs. $3,811.65 was awarded to Penn-Dixie, and $6,700 to Stauffer.

On December 4, 1979, a nonjury hearing was held in the circuit court of Will County on the final two counts of Frieder's complaint against Penn-Dixie. Following the presentation of the plaintiff's case-in-chief, defendant Penn-Dixie moved for judgment under section 64(3) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 64(3)). Penn-Dixie's motion was granted, judgment was entered for the defendant, and counts IX and X of Frieder's complaint against Penn-Dixie were dismissed. An order dated December 28 made the judgment and the order of September 27 awarding section 41 relief to Penn-Dixie and Stauffer final and appealable.

On appeal, plaintiff Frieder attacks the propriety of both the September 27 order awarding attorney's fees and costs to the defendants pursuant to section 41 of the Civil Practice Act and the December 28 judgment entered in favor of Penn-Dixie in the drainage case. We will first concern ourselves with the merits of Frieder's appeal from the September 27 order.

Before the propriety of the circuit court's decision to award Penn-Dixie and Stauffer attorney's fees and costs pursuant to section 41 of the Civil Practice Act can be reviewed, the factual bases of Frieder's complaints against defendants Penn-Dixie and Stauffer must be understood. Frieder, Penn-Dixie and Stauffer are contiguous property owners in the Joliet, Illinois, area. All three utilize a city sewer known as the Bluff Street Interceptor to dispose of their sanitary sewage. Of the three, Penn-Dixie is the northernmost property owner that uses the Bluff Street Interceptor. Frieder's property is located to the south of Penn-Dixie, and

Stauffer is located south of Frieder. Frieder was the last to connect up, in December of 1973 or January of 1974. Penn-Dixie, Frieder, and Stauffer originally used gravity pumps to drain their sewage from private lines into the Bluff Street Interceptor. Periodically, however, the Bluff Street Interceptor developed a "head" (internal pressure in the sewer caused by a full line) which precluded sewage driven by gravity alone from entering this sewer from private lines. Consequently, Frieder, Penn-Dixie, and Stauffer all experienced sewage backup problems.

In 1974, Richard Ciesla, director of utilities of the city of Joliet, spoke with representatives of Penn-Dixie, Stauffer, and the Joliet Industrial District (Frieder). He suggested to them that the sewage backup problems could be remedied by the utilization of force pumps to pump sewage into the Bluff Street Interceptor. Both Penn-Dixie and Stauffer subsequently installed force pumps, and their sewage backup problems alleviated. Frieder, however, declined to install a force pump, and sewage continued to back up onto his property.

In 1975, the State of Illinois began proceedings against Frieder in the circuit court of Will County for various violations of the Illinois Environmental Protection Act dating back to the year 1972. Frieder then filed a third-party complaint (and subsequently the separate lawsuit) against both Penn-Dixie and Stauffer, alleging that his sewage backup problems were caused by the defendants' utilization of force pumps. As previously stated, the third-party complaint was voluntarily dismissed by Frieder on May 8, 1978, when the State dismissed its EPA action against him, and Frieder voluntarily agreed to the entry of summary judgment in favor of both Penn-Dixie and Stauffer in case No. W76G1090CH, the direct action, on July 20, 1979. However, both defendants moved for taxing of expenses and attorney's fees against Frieder under section 41 of the Civil Practice Act on the grounds that the allegations made by Frieder in his third-party complaint (No. W75G1203CH) and subsequent lawsuit (No. W76G1090CH) with regard to the causation of the sanitary sewage backup and discharge onto his property were made without reasonable cause and were untrue. It is the propriety of the September 27 order granting the defendant's motions for section 41 relief that plaintiff asks us to review.

■■■ A preliminary matter that we must discuss concerns the requisite elements of a section 41 motion and the concomitant burden of proof upon the movant. Prior to September 19, 1976, the moving party seeking attorney's fees and expenses under section 41 had the burden of showing that the allegations of the opponent were made without reasonable cause, not in good faith, and found to be untrue. (Ill. Rev. Stat. 1975, ch. 110, par. 41; *Grover v. Commonwealth Plaza Condominium Association* (1979), 76 Ill. App. 3d 500, 394 N.E.2d 1273.) A 1976 amendment to section 41, however, eliminated the requirement that the movant prove

the pleadings were made in the absence of good faith (Pub. Act 79-1434, §8, effective September 19, 1976; Ill. Ann. Stat., ch. 110, par. 41, Supplement to Historical and Practice Notes, at 20 (Smith-Hurd 1980-1981 Supp.)). Frieder contends that because both the third-party complaint in No. W75G1203CH and the complaint in No. W76G1090CH were filed before September 19, 1976, the version of section 41 in effect at the time (which required the movant to prove lack of good faith by the pleader) is applicable. In response, defendants Penn-Dixie and Stauffer contend that the version of section 41 applicable is governed not by the date of the operative facts but rather by the date on which the section 41 motion is filed (see *Courie v. Home Insurance Co.* (1977), 53 Ill. App. 3d 593, 368 N.E.2d 1029 (motion for attorney's fees filed prior to September 15, 1976, and therefore old section 41 elements applicable)). We believe the latter approach is preferable and the proper one. What we are concerned with here is the defendants' statutory burden of proof. A party's statutory burden of proof cannot be governed by a statute no longer in effect at the time the proceeding in which that party has the burden is initiated. In the instant case, Penn-Dixie and Stauffer's section 41 motions were filed well after September 19, 1976. Consequently, the current statutory language governs.

■■■ Under the present section 41, "Allegations * * * , made without reasonable cause and found to be untrue, shall subject the party pleading them to the payment of reasonable expenses, actually incurred by the other party by reason of the untrue pleading, together with a reasonable attorney's fee * * * ." (Ill. Rev. Stat. 1979, ch. 110, par. 41.) Lack of good faith on the part of the pleader need not be shown. It need only be shown that the allegations were made without reasonable cause and were found to be untrue (see *Brainerd v. Flannery* (1978), 56 Ill. App. 3d 991, 373 N.E.2d 26). Further, "[t]he application of section 41 is within the discretion of the trial court" (*Brainerd*, 56 Ill. App. 3d 991, 996, 373 N.E.2d 26, 29. Accord, *Farwell Construction Co. v. Ticktin* (1978), 59 Ill. App. 3d 954, 376 N.E.2d 621; *Dudanas v. Plate* (1976), 44 Ill. App. 3d 901, 358 N.E.2d 1171; *Village of Evergreen Park v. Spangler* (1976), 40 Ill. App. 3d 947, 353 N.E.2d 257), and, accordingly, the taxing of fees and costs is not to be reversed absent a showing of abuse of discretion.

Because the hearing on the defendant's section 41 motions was conducted without the presence of a court reporter, we do not know the precise facts brought to the attention of the trial court on which it based its conclusion that Frieder's allegations against the defendants were made without reasonable cause and were untrue. It is uncontradicted, however, that the trial court based its decision at least in part on the affidavit of Richard Ciesla, which was originally submitted in support of Stauffer's motion for summary judgment in case No. W76G1090CH, and on the

statements of Frieder himself in a discovery deposition. Briefly, in his affidavit Ciesla states that in 1974 he informed Frieder (through discussions with agents of the Joliet Industrial District), Penn-Dixie and Stauffer that the implementation of force pumps would alleviate the sewage backup and sanitary drainage problems that they were then experiencing due to the blockage of the Bluff Street Interceptor. Ciesla further stated that "such use of force pumps is acceptable, reasonable, desirable and in compliance with City of Joliet standards, and does not cause the sewage in the Bluff Street Interceptor to back up and discharge onto the property of other users of the pipe but merely increases the pressure or rate of flow." He concluded his affidavit by stating that the sewage backup onto Frieder's property was not caused by the use of force pumps by Penn-Dixie or Stauffer. In his discovery deposition, Frieder admitted that the Bluff Street Interceptor had oftentimes been blocked, and that he had personal knowledge of foreign objects such as carpeting blocking the sewer line and causing a backup.

■■■ Plaintiff Frieder argues at length that the circuit court's decision to award attorney's fees and expenses to the defendants was improper because in so doing it incorrectly considered Ciesla's affidavit. Frieder attacks the sufficiency of Ciesla's affidavit on numerous grounds, alleging, *inter alia*, that Ciesla did not attest to personal knowledge in making his affidavit, that his affidavit was based upon hearsay, that no statement was made in the affidavit that the affiant if called as a witness, could competently testify to the statements contained therein, and that the statements in the affidavit were conclusory. Most of these allegations are derived from the requirements of affidavits filed in proceedings under sections 57, 48 and 20(2) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, pars. 57, 48, 20(2)) and Supreme Court Rule 276 (Ill. Rev. Stat. 1979, ch. 110A, par. 276), as set forth in Supreme Court Rule 191(a) (Ill. Rev. Stat. 1979, ch. 110A, par. 191(a)). However, because Rule 191(a) deals specifically with only four types of proceedings, we do not believe that the requirements set forth in that rule for affidavits are to apply to affidavits filed in conjunction with all other types of civil proceedings. *Expressio unius est exclusio alterius.* Further, the plaintiff had the opportunity to object to the sufficiency of Ciesla's affidavit under Rule 191(a) when the defendants submitted it in support of their motions for summary judgment, but declined to do so. Regarding the claim that Ciesla's affidavit contains hearsay, reference is made to paragraph 8 of the affidavit, in which Ciesla states that through ongoing discussions with representatives of the Joliet Industrial District, Penn-Dixie and Stauffer by "my staff and me, I have personal knowledge of the various sewage systems used by the J.I.D., Stauffer, and Penn-Dixie * * * ." This statement, however, does not constitute hearsay. "Hearsay evidence is

\* \* \* written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741; Accord, E. Cleary & M. Graham, Handbook of Illinois Evidence §801.1 (3d ed. 1979).) Paragraph 8 was included in Ciesla's affidavit to establish that the fact that Ciesla has personal knowledge of the litigants' sewer systems. It was not included to establish the truth of any statements made by Ciesla's staff, Frieder's representatives, or the agents of the defendants. Further, the statement that Ciesla had personal knowledge of the various sewer systems was made by Ciesla himself. The value of that statement, therefore, does not hinge upon the credibility and veracity of anyone other than the asserter. Clearly Ciesla's statements are not encompassed within the definition of hearsay provided above.

Based upon the foregoing, we believe that the trial court did not err when it considered Ciesla's affidavit in conjunction with the defendant's section 41 motion. On the basis of this affidavit, Frieder's discovery deposition (which may be used for the same purposes as an affidavit (Ill. Rev. Stat. 1979, ch. 110A, par. 212(a)(4))), and other evidence and testimony brought to the court's attention at the hearing, the trial court held that the defendants had made a prima facie case for section 41 relief that was unrebutted by the plaintiff. Given the fact that the trial court could properly consider Ciesla's affidavit and Frieder's discovery deposition, and that we do not have the benefit of a written transcript of the hearing on the defendants' section 41 motions, we cannot say as a matter of law that the court abused its discretion in awarding to Penn-Dixie and Stauffer attorney's fees and reasonable expenses incurred in defending Frieder's third-party complaint in No. W75G1203CH and subsequent lawsuit (No. W76G1090CH). We therefore affirm the September 27 order of the circuit court of Will County.

The second issue with which we are concerned involves the propriety of the December 28, 1979, judgment in the circuit court of Will County in defendant Penn-Dixie's favor on counts IX and X of Frieder's complaint in No. W76G1090CH. As we have previously stated, in counts IX and X Frieder alleges that Penn-Dixie had engaged in some earth-moving operations on its property that had impeded the natural flow and drainage of water from plaintiff's property, and that Frieder had been damaged thereby in the amount of $300,000. Frieder also asked for injunctive relief. At a nonjury hearing on these two counts, Penn-Dixie moved for judgment following the presentation of Frieder's case-in-chief, under section 64(3) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 64(3)). The defendant's motion was granted and the counts dismissed.

Section 64(3) of the Civil Practice Act provides:

"(3) In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered. If the ruling on the motion is adverse to the defendant he may proceed to adduce evidence in support of his defense, in which event the motion is waived."

In *Geiger v. Zikic* (1980), 81 Ill. App. 3d 1016, 401 N.E.2d 1260, the First District Appellate Court pronounced the applicable standard for appellate review of an action terminated pursuant to section 64(3): "On appeal, the reviewing court must, itself, examine the evidence and determine whether the trial court, after weighing the evidence, erred in deciding that plaintiff failed to make out a prima facie case. To decide whether the plaintiff made out a prima facie case, the trial court must evaluate the evidence by determining credibility of witnesses and reasonable inferences to be drawn from their testimony. * * * [T]he reviewing court should not reverse unless after reviewing the evidence it finds the trial court erred in deciding the case contrary to the manifest weight of the evidence." (81 Ill. App. 3d 1016, 1019, 401 N.E.2d 1260, 1262-63. See *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43.) It is to this task that we direct ourselves.

As a preliminary matter, we must admit that the facts relevant to this case, as disclosed in the report of proceedings in this cause on December 4 and 5, 1979, are difficult to compile in an orderly fashion, much less review. We merely wish to preface our recitation of the facts with the statement that even as of this writing there is some uncertainty.

As previously stated, Penn-Dixie and Frieder are adjoining landowners in the Joliet area. Penn-Dixie is located to the west of the Des Plaines River and the E. J. & E. railroad tracks, and directly to the north of Industry Avenue. Frieder's property is also west of the river and railroad tracks, but is located directly south of Industry Avenue. All of the land east of the railroad tracks to the river is man-made.

Prior to 1960, storm water generally could drain to the east down Industry Avenue and into a 30" culvert that ran underneath the intersection on Industry Avenue and the railroad tracks, at an angle from the northwest corner to the southeast corner. From this culvert, this water would drain into an open man-made drainage ditch which led directly to the channel of the Des Plaines River.

One of Penn-Dixie's predecessors in interest was the Union Tank Car Company. In 1961, Union Tank held a lease from the Metropolitan Sanitary District of all of the land east of Frieder's property and the

railroad tracks to the river. Union Tank's plan at this time was to build on this land (the "river property") a settling pond and a treatment plant. In conjunction with the construction of this treatment plant, spoil banks located on the river property remaining from dredging operations in the 1930's by the Army Corps of Engineers were to be leveled, and the open drainage ditch running from the 30" culvert was to be filled. Prior to the leveling and filling operation, Union Tank entered into an agreement with Frieder on October 4, 1961, in which Frieder quitclaimed to Union Tank all rights and interests in the river property in exchange for $2,600 and Union Tank's promise to construct a 14" storm sewer from Frieder's property to the Des Plaines River, with Frieder to provide all future maintenance and repairs. In addition, Frieder was given an easement to construct another 6" pipe from his property to the river. The agreement further provided in paragraph 11 that "Anything hereinabove notwithstanding, it is understood that Union Tank during the term of its lease of the River Property from the Sanitary District of Chicago, will fulfill its existing legal obligation to provide drainage for the natural flow of surface water from your [Frieder's] property over the River Property to the Des Plaines River." This agreement was binding upon all successors in interest. Pursuant to the agreement, the 14" storm sewer was constructed in either 1962 or 1963, and the man-made ditch was filled in.

Although for several years after the leveling and filling operation took place, Frieder experienced no drainage problems, he eventually began to have difficulty with drainage from his property. Water would accumulate west of the railroad tracks and south of Industry Avenue. At times, the E. J. & E. tracks would be covered by water. A building on Frieder's property that had been standing until 1978 would regularly flood with one to two inches of water every spring.

Frieder's drainage problems prompted him to write a letter to another of Penn-Dixie's predecessors, Phoenix Manufacturing Company, in June of 1974. In his letter, Frieder informed Phoenix of his drainage problems, which he felt were due to the inability of the 14" sewer to properly function. He concluded by informing Phoenix that "[o]ur attorneys advise us that it is your responsibility to keep this area drained at least as well as before it was filled." Phoenix responded several days later, and informed Frieder that it, too, experienced drainage problems after a heavy rainfall. Phoenix further suggested to Frieder that his drainage problems could be alleviated by the installation of a storm sewer catch basin. However, Phoenix denied any responsibility for Frieder's drainage difficulties, which continued to the date of the trial.

In addition to the 14" storm sewer, Frieder's property was also served by a 24" city of Joliet sanitary sewer (the Bluff Street Interceptor) subsequent to 1973. As we have previously related in connection with the

section 41 issue raised in this case, periodically sanitary sewage would be unable to flow into this sewer and would back up and discharge onto Frieder's property. Apparently, some of this raw sewage would flow into the manholes for the 14″ storm sewer (which were at a lower elevation than the manholes for the sanitary sewer) and eventually discharge into the Des Plaines River. It was this sanitary sewage discharge into the Des Plaines River that led in part to the lawsuit brought against Frieder for EPA violations in 1975. In that year, the State ordered the 14″ storm sewer sealed off to prevent any more sewage discharge into the river.

The basic contention of the plaintiff in counts IX and X of his complaint against Penn-Dixie in No. W76G1090CH is that the leveling of the spoil banks on the river property and the filling in of the man-made drainage ditch from the 30″ culvert to the channel early in the 1960's disturbed the "natural flow" of drainage from the plaintiff's property to the Des Plaines River. Consequently, to make a prima facie case sufficient to withstand a motion for judgment under section 64(3) of the Civil Practice Act, the burden was on the plaintiff to prove two things: First, the plaintiff had to prove what in fact the natural flow of surface water had been; and second, the plaintiff had to prove that the leveling and filling by defendant's predecessors altered the drainage pattern without plaintiff's consent. We believe the plaintiff has failed on both counts.

As we read the record, the natural flow of surface water on plaintiff's land is from west to east down Industry Avenue to, and perhaps through, the railroad bed. There is some evidence of the existence of a shallow surface drainage ditch along the east boundary of the railroad right of way that took surface water from north to south. That drainage pattern was unaffected by the construction occurring on the river property in the early 1960's. Although it is true that prior to the leveling and filling operation, drainage down Industry Avenue emptied into an old channel of the Des Plaines River via a 30″ culvert and man-made ditch, these conditions were obviously not natural but artificial. The plaintiff's own expert witness, engineer Robert Hamilton, testified that a topographical survey taken of the river property by the Army Corps of Engineers in 1939 does not reveal the existence of the drainage ditch running from the culvert to the channel. The shallow drainage ditch or swale referred to above running on the east side of and parallel to the railroad tracks from Industry Avenue south to Stauffer's property line, and then east to the river does appear on this survey, but that swale still exists today. Other than Hamilton's testimony and the exhibits establishing the existence of the above mentioned swale of unknown origin, the record is devoid of any evidence on the *natural* drainage pattern across the river property prior to 1930. Plaintiff cannot claim that the natural flow of drainage from

his property was disturbed by the defendant and its predecessors in interest without first showing to the court's satisfaction just what the natural drainage pattern was. We agree with the trial court that this he has failed to do.

Assuming *arguendo* that plaintiff's natural drainage flow from his property to the Des Plaines River was altered or disrupted by the leveling and filling in, the next question is whether the flow was altered or blocked by the defendant or its predecessors in interest without plaintiff's consent. Again, the answer must be in the negative. By virtue of Frieder's 1961 contract with Union Tank, the plaintiff voluntarily quitclaimed *all* rights he had in the river property (which must necessarily include by implication drainage easement rights) to Union Tank for $2,600 and the construction by Union Tank of a 14" storm sewer. In short, the plaintiff voluntarily consented to the elimination of any "natural" drainage he had in exchange for the construction of a 14" storm water sewer, which was in fact constructed. Further, we do not see any benefit to the plaintiff in his reliance upon paragraph 11 of the contract, in which defendant's predecessor promised to "fulfill its existing legal obligation to provide drainage for the natural flow of surface water" from Frieder's land across the river property to the Des Plaines. It would appear that natural surface water drainage from the plaintiff's property was either nonexistent or contracted away, and for almost 20 years the defendant and its predecessors provided the plaintiff drainage by way of the 14" sewer. That sewer is now closed because of the plaintiff's alleged EPA violations. If the plaintiff is looking for someone on which to place the blame for his current inability to dispose of storm water, he need not look any further than himself. The defendant has no duty, contractual or otherwise, to provide an alternative means of drainage for the plaintiff when the main means of storm water drainage from the plaintiff's property has been terminated as a result of the plaintiff's violation of this State's pollution laws.

■■ In light of the foregoing, we hold that plaintiff Frieder failed to make a prima facie case against Penn-Dixie, and consequently, entry of judgment for the defendant under section 64(3) in case No. W76G1090CH was not against the manifest weight of the evidence.

Both the order of the circuit court of Will County awarding section 41 relief to the defendants Penn-Dixie and Stauffer and the judgment in Penn-Dixie's favor on counts IX and X of plaintiff's complaint filed in cause No. W76G1090CH are affirmed.

Affirmed.

SCOTT and STENGEL, JJ., concur.